In re DAHLGREN INTERNATIONAL, INC., Debtor.

BALDWIN TECHNOLOGY CORPORATION, Plaintiff,

v.

DAHLGREN INTERNATIONAL, INC., Defendant.

Civ. No. 3:89–CV–0501–H.

United States District Court, N.D. Texas, Dallas Division.

Aug. 7, 1992.

William B. Steele, III, Susan L. Karamanian, Locke Purnell Rain Harrell, Dallas, TX, Warren H. Rotert, Vincent A. Castiglione, Morgan & Finnegan, New York City, for plaintiff.

Donald C. Templin, Haynes & Boone, Bill C. Hunter, Hunter Van Amburgh & Wolf, Dallas, TX, and Daniel W. Sixbey and Stuart J. Friedman, Sixbey Friedman Leedom & Ferguson, McLean, VA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SANDERS, Chief Judge.

This case was tried before the Court without jury on July 20–23, 1992. The Court has considered the pleadings, evidence, and arguments of counsel and makes the following Findings of Fact and Conclusions of Law. Any finding may be deemed a conclusion, and any conclusion may be deemed a finding.

### FINDINGS OF FACT

*I. Background*

1. This is a patent infringement action brought by Baldwin Technology Corporation ("Baldwin") against Dahlgren International, Inc. ("Dahlgren") alleging patent infringement of United States Letter Patent No. 4,724,764 entitled "Dampening System," which was issued on February 16, 1988.

2. Both Baldwin and Dahlgren are in the business of making accessories for lithographic printing presses. The product at issue in this suit is one such accessory—a "dampening system." The purpose of a dampening system within a lithographic press is to apply a thin film of water onto the non-image area of the lithographic plate so that when ink is subsequently applied, it will not adhere to the non-image area, but adhere only to the image area. In a modern lithographic press, the lithographic plate is a thin aluminum sheet on which the image to be printed is prepared. The plate, furthermore, is wrapped around—mounted—on a cylinder, called the "plate cylinder." (Testimony of MacPhee)

3. The dampening system within a lithographic press typically consists of a series of rollers, with one roller immersed in a pan of fountain solution or water and another roller, the "dampening form roller," in continuous contact with the plate cylinder. Once the plate cylinder is "dampened" by the dampening system, a second set of rollers, called the inking system, applies ink to the plate cylinder. Traditionally, the plate cylinder and the rollers comprising the dampening system and the inking system all rotated at the same speed. (Testimony of MacPhee)

4. Plaintiff Baldwin designed a dampening system that, in addition to serving the traditional function of a dampening system, would also prevent certain imperfections common to lithography from appearing on the printed surface. Those undesired imperfections or flaws include "hickeys," "ghost-

ing," and "ink emulsification." Hickeys are caused when an unwanted spec sticks to the plate cylinder of the printing press, causing small blemishes on the printed sheet. Ghosting is said to occur when an unwanted pattern faintly appears in an "image area" on the printed sheet. Ink emulsification occurs when too much water becomes mixed with the ink in the printing process, thus altering the properties of the ink and causing it to not transfer properly. (Testimony of MacPhee)

5. Baldwin's dampening system was designed by John MacPhee, a Baldwin employee, with the help of Larry Lester, who had lent MacPhee a lithographic press with which to develop and test the new product. MacPhee's goal when he first began work on his idea in 1981 was to design a dampening system that would remove hickeys. He thought this might be accomplished by rotating the dampening form roller of the dampening system at a slower speed than the plate cylinder, causing slippage or a wiping action to occur between the plate cylinder and the dampening form roller. (Testimony of MacPhee)

6. MacPhee's idea for picking hickeys was influenced by the earlier work and patent of Julius Domoter. Domoter's invention removed hickey producing foreign particles by rotating an ink form roller (an inking roller in contact with the plate cylinder) at a different speed than the plate cylinder. This difference in surface speeds, known as the "Delta concept," caused a controlled wiping action (slippage) between the ink form roller and the plate cylinder. Domoter specifically acknowledged that he did not know why his hickey removal system worked. Domoter suggested in his patent that controlled slippage between the dampening form roller and the plate cylinder might also remove hickeys. Baldwin was a licensee under the Domoter patent, but had been unable to successfully commercialize the Domoter device. One specific problem was that existing presses could not easily be retro-fitted to add the Domoter device. MacPhee believed that a dampening system that incorporated the Delta concept would be more commercially successful, as dampening systems are more amenable to retro-fitting. (Testimony of MacPhee;

Plaintiff's Exhibit 11, Col. 6, lines 9 and 46–52)

7. On May 11, 1983, MacPhee filed a patent application. Early tests of MacPhee's concept revealed that it was indeed effective in removing hickeys, but that it had the unfortunate side effect of creating a special form of ghosting. Larry Lester conceived of an idea to solve this problem; his solution was to add an ink receptive roller, in contact with the dampening form roller, that would rotate at a different speed than the plate cylinder. On December 12, 1983, MacPhee filed a new patent application adding the Lester contribution as a joint invention. (Testimony of MacPhee; PX–190; PX–1A)

## II. The MacPhee Patent

8. The MacPhee patent-in-suit discloses a dampening system to remove foreign particles (hickeys) from the plate cylinder, to reduce and/or eliminate ghosting, and to control and/or eliminate ink emulsification. The patent discloses rotating the plate cylinder with the press drive, and provides a supply of dampening fluid in a pan, and includes a pan (transfer) roll having a chrome surface. The dampening fluid is caused to be metered onto the dampening form roll by the pan (transfer) roll and the metering roll. The dampening form roller is in continuous contact with the plate cylinder and the pan (transfer) roll, and has an ink receptive roller in contact with the dampening roller to cause rotation of the ink receptive roller by the rotation of the dampening roller at a different speed than the plate cylinder. (PX–1)

9. In all the embodiments of the MacPhee patent, hickey removal is caused by rotating the dampening form roller at a different surface speed than the plate cylinder to cause a wiping action between the dampening form roller and the plate cylinder, but the patent claims a new combination of the wiping action with means to control ghosting and emulsification. (PX–1)

10. The MacPhee patent discloses controlling and/or preventing ink emulsification and ghosting by rotating the ink receptive roller at a different surface speed than the plate cylinder, and preferably at the same speed as the dampening roll. The MacPhee

patent discloses an embodiment, in Figure 6, where the ink receptive roller does not touch the first ink form roller, i.e., does not act as a bridge roller between the dampening form roller and the first ink form roller. However, the MacPhee patent specifically mentions that the ink receptive roller is in contact with the dampening form roller and driven at the same speed so as to prevent ink emulsification and ghosting by any convenient means, such as contact, and even gearing. (PX–1)

11. Independent claims 1 and 10 of the MacPhee patent describe a dampening device for hickey removal and for reducing ghosting. Claim 7 describes a process consisting of a series of steps for removing hickeys and preventing ghosting. Claims 2, 3 and 6 are dependent on Claim 1. (PX–1)

12. The applications of the MacPhee patent having Serial Nos. 06/493,440 and 06/732,264, which relates to Figures 1–4 of the patent-in-suit, were not allowed by the United States Patent and Trademark Office because of the Domoter patent. The joint patent application of MacPhee and Lester bearing Serial No. 06/560,506 which relates to Figures 5–7 became patent number 4,724,764 (hereafter '764 patent).

### III. Dahlgren's Infringement

13. While the MacPhee patent application was pending, Epic Products International Corporation ("Epic"), a dampening system manufacturer, obtained an exclusive license from Baldwin, calling its product the Epic Delta Dampener. Epic has paid to Baldwin about $2 million in royalties under that license. (Testimony of MacPhee)

14. After the Epic Delta dampener was introduced, MacPhee wrote an article describing it. Dahlgren immediately asked MacPhee to include in the article a description of its own four-roll dampener utilizing gears to maintain the traditional 1:1 ratio between the dampening form roller and plate cylinder. Initially, after introduction of the Epic Delta dampener, Dahlgren clung to its original 1:1 ratio, believing the wiping action of the Epic product to be a "disadvantage" because it might cause plate and gear wear. (Testimony of MacPhee, Taylor; PX–23; PX–33)

15. In 1985, Dahlgren introduced a product, the Marcum Dampener, that was designed to compete directly with the Epic dampener. Dahlgren was impressed with the Epic dampener and felt that it was a new and significant addition to the dampener market. (Testimony of Bronson)

16. After the failure of the Marcum Dampener, Dahlgren began to make the alleged infringing device, called the Dahlgren Four Roll Dampener with Differential Drive. Dahlgren produced two different models of its Four Roll Dampener with Differential Drive, described and represented respectively by Plaintiff's Exhibit 2 and Plaintiff's Exhibit 164 (hereafter PX–2 and PX–164). The two models differ only in the roll structure used to transfer the dampening fluid from the water pan to the dampening form roll. This difference is for the purpose of conforming to different press configurations. Otherwise, the operations are the same. In the first form shown by PX–2, the metering roll is also the pan roller. In the second form shown by PX–164, the transfer roll is also the pan roller. (PX–2; PX–164)

17. The Dahlgren Four Roll Dampener with Differential Drive is used for sheet-fed lithographic printing presses. The accused dampener unit is placed ahead of the inking system in that the dampening fluid is applied to the plate cylinder before ink is applied to the plate cylinder. As in the Epic dampener, the dampening unit consists of a plurality of cylindrical rollers which are in cooperative relationship with one another and the plate cylinder. Dahlgren's differential drive dampener is designed to remove hickeys and prevent ghosting. This is accomplished by providing a press drive for rotating the plate cylinder, and by providing a supply of dampening fluid in a pan which is metered by the metering roll, which is transferred by the transfer roll to the dampening form roller. The dampening form roller is in continuous contact with the transfer roll and with the plate cylinder, and there is an ink receptive roller in engagement with the dampening roller. Hickeys are removed by causing rotation of the dampening form roller to cause a wiping action, or controlled slippage, be-

tween the dampening form roll and the plate cylinder. Ink emulsification and ghosting are controlled by rotating an ink receptive roller in engagement with the dampening roll at a different speed than the plate cylinder. The accused differential drive unit has the same theory of operation, does the same thing, and functions in substantially the same way to accomplish the same purpose as the '764 patent. (Testimony of Roberts; Deposition and Testimony of Taylor; PX–1; PX–2; PX–164)

### IV. Claims 1, 7, and 10 of the '764 Patent are Literally Infringed

■ 18. The accused differential drive units, PX–2 and PX–164, first manufactured and sold by Dahlgren and later manufactured and sold by Dahlgren U.S.A. under license from Dahlgren, infringed Claims 1, 7 and 10 of the '764 patent. Claims 1 and 7 are literally infringed by the PX–164 device; claim 10 is literally infringed by the PX–2 device. (Testimony of Roberts)

19. Dahlgren obtained an opinion dated March 31, 1988 from the attorney of one of its customers, Case–Hoyt, that concluded that the Dahlgren differential drive unit shown in PX–2 literally infringed Claim 10 of the '764 patent. The Court agrees with that assessment. Claim 10 includes the following limitations:

10. In a contact lithographic press having an inking system in continuous contact with a continuous contact dampening system having a plurality of rotating dampening rollers for feeding ink and dampening fluid continuously to a rotatable plate cylinder, a device for dampening the rotatable plate cylinder of the lithographic press of the type having drive means for rotating said plate cylinder and for rotating the other rollers in the lithographic press system comprising:

(a) a pan supply of dampening fluid,

(b) pan roller means rotating in said supply of dampening fluid,

(c) metering means in cooperative relationship with said pan roller adapted to meter the thickness of dampening fluid,

(d) one of said dampening system rollers being in continuous contact with said pan roller,

(e) one of said dampening system rollers being a rotating contact roller in contact with said rotating plate cylinder and adapted to receive on its surface metered dampening fluid whereby dampening fluid is transferred from said dampening fluid supply to said rotating contact roller and to said plate cylinder,

(f) an ink receptive roller and means mounting said ink receptive roller in surface contact with said rotating contact dampening roller,

(g) means to remove foreign particles from said plate cylinder by said rotating contact dampening roller, said means to remove including means in said drive means to rotate said plate cylinder and said rotating contact dampening roller at different surface speeds to provide a wiping action between said plate cylinder and said rotating dampening roller, and

(h) means to control ink emulsification and reduce ghosting, said means to control and reduce including said ink receptive roller being in contact with said rotating contact dampening roller, and means in said drive means to rotate said ink receptive roller and said plate cylinder at different surface speeds.

As testified to by Baldwin's expert witness, Webster Roberts, the differential drive unit of PX–2 corresponds with each and every limitation of Claim 10. Dahlgren did not refute Roberts' testimony. (PX–1; PX–2; Testimony of Roberts; PX–129)

20. Roberts also compared Claim 1 of the '764 with the accused PX–164 device, showing that each limitation contained in each paragraph of Claim 1 literally described the device of PX–164. Claim 1 of the '764 patent includes the following limitations:

1. In a continuous lithographic press having an inking system in continuous contact with a dampening system for feeding ink and dampening fluid continuously to a rotatable plate cylinder, a device for dampening the rotatable plate cylinder of the lithographic press of the type having drive

means for rotating said plate cylinder and for rotating the other rollers in the lithographic press system comprising:

(a) a pan supply of dampening fluid,

(b) pan roller means rotating in said supply of dampening fluid,

(c) metering means in cooperative relationship with said pan roller adapted to meter the thickness of dampening fluid,

(d) a rotating dampening roller in continuous contact with said pan roller and in contact with said rotating plate cylinder and adapted to receive on its surface metered dampening fluid whereby dampening fluid is transferred from said dampening fluid supply to said rotating roller and to said plate cylinder,

(e) an ink receptive roller and means mounting said ink receptive roller in surface contact with said rotating dampening roller,

(f) said drive means being operatively associated with said plate cylinder to cause rotation thereof said drive means being operatively associated with said rotating dampening roller to cause rotation thereof,

(g) means to remove foreign particles from said plate cylinder by said rotating dampening roller, said means to remove including means in said drive means to rotate said plate cylinder and said rotating dampening roller at different surface speeds to provide a wiping action between said plate cylinder and said rotating dampening roller, and

(h) means to control ink emulsification and reduce ghosting, said means to control and reduce including said ink receptive roller being in contact with said rotating dampening roller, and means in said drive means to rotate said ink receptive roller and said plate cylinder at different surface speeds.

Because the differential drive unit of PX–164 matches up with each and every limitation of Claim 1, the Court finds that the PX–164 device literally infringes Claim 1.

21. Roberts' testimony, moreover, established that users of the accused PX–164 device literally infringed process Claim 7 of the '764 patent. Claim 7 of the '764 patent includes the following limitations:

7. A process of removing hickeys and preventing ghosting by applying dampening solution to the plate cylinder of a lithographic printing press of the type having a continuous dampening system comprising the steps of:

a. rotating the plate cylinder;

b. providing a supply of dampening fluid and a pan roller having a hydrophilic surface;

c. providing a dampening fluid applying roller in continuous engagement with said pan roller and in contact with the surface of the plate cylinder and providing an ink receptive roller in engagement with the dampening roller;

d. causing a metered supply of dampening fluid to be on the surface of the dampening fluid applying roller;

e. removing hickeys by rotating the dampening roller at a different surface speed than the plate cylinder causing a wiping action between the surfaces of the dampening roller and the plate cylinder; and

f. preventing ink emulsification by rotating the ink receptive roller in engagement with the dampening roller at a different surface speed than the plate cylinder.

The process steps carried out by the use of the accused Four Roll Dampener with Differential Drive of PX–164 are the same as the process steps described by Claim 7 of the '764 patent. Claim 7 has been literally infringed by the PX–164 device.

## V. Impact of Dahlgren's Bankruptcy

22. Dahlgren filed bankruptcy under Chapter 11 of the United States Bankruptcy Code on December 29, 1986. Dahlgren maintained possession of its assets and continued to operate its business pursuant to sections 1107 and 1108 of the Code. Subsequent to termination of its bankruptcy proceedings, on or about January 1, 1989, Dahlgren stopped manufacturing the differential drive unit. Pursuant to the bankruptcy proceeding, Dahlgren entered into a sale agreement transferring numerous assets, including

manufacturing assets, to Dahlgren U.S.A. Dahlgren licensed Dahlgren U.S.A. to use its proprietary technology, engineering drawings, and intellectual property to manufacture the Dahlgren Four Roll Dampener with Differential Drive.

23. Dahlgren's Second Amended Plan of Reorganization was confirmed by the Bankruptcy Court on May 12, 1989. Pursuant to the terms of the plan, by Memorandum Opinion and Order, filed August 7, 1992, and effective June 22, 1992, *nunc pro tunc*, this Court limited the money damages recoverable in this suit to those that arose post-confirmation, or after May 12, 1989.

*VI. Willful Infringement and Damages*

24. The '764 patent issued on February 16, 1988, and on March 8, 1988, Baldwin notified Dahlgren and its customer, Case–Hoyt, in writing as to its patent rights, which obligated Dahlgren to affirmatively act to avoid infringement. Soon after issuance of the patent, Dahlgren wrote Case–Hoyt a letter promising to indemnify and defend Case–Hoyt against any threatened patent infringement suit. (PX–192; PX–193; PX–109)

25. Soon after being notified of the potential infringement claim, Case–Hoyt obtained, at Dahlgren's expense, a legal opinion as to whether the Dahlgren product infringed the '764 patent. Case–Hoyt's attorney, Shlesinger, concluded that Claim 10 was infringed, but suggested that Dahlgren file for reexamination of the patent. Dahlgren never sought reexamination. (PX–129)

26. Dahlgren later received an opinion from its own counsel, Sixbey, who stated that he had "no quarrel with the general conclusions reached in [Shlesinger's] opinion," but that he disagreed with Shlesinger's conclusion that Claim 10 was infringed. Sixbey advised Dahlgren to obtain yet another opinion so that Dahlgren would be "well insulated from a charge of willful and wanton infringement if suit were brought." Dahlgren never sought another opinion on infringement. Of the two opinions Dahlgren did receive, neither addressed the PX–164 device, but instead dealt exclusively with the PX–2 dampener. Dahlgren obtained no opinion on the PX–164 dampener. (PX–138; PX–139)

27. Dahlgren receives a royalty of seven and one half percent (7–½%) of the net sales price of the dampener units made by its licensees of the PX–2 and PX–164 units. (PX–229)

*Conclusions of Law*

1. Under 35 U.S.C. § 282, the '764 patent enjoys a presumption of validity. The burden of establishing invalidity rests with Dahlgren, the party asserting invalidity in this case. The statutory presumption of patent validity can be overcome, but Dahlgren has the heavy burden to prove invalidity by clear and convincing evidence. *Hughes Tool Co. v. Dresser Industries, Inc.*, 816 F.2d 1549, 1555 (Fed.Cir.), *cert. denied*, 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987).

2. Dahlgren has attacked the validity of the '764 patent on a variety of fronts. Dahlgren maintains that the claims of the '764 patent are invalid under 35 U.S.C. § 102(b) because (1) the claims of the '764 patent were anticipated by an earlier patent, and (2) the alleged invention was on sale and in the public use for more than one year prior to the '764 patent filing date. Dahlgren also asserts invalidity under 35 U.S.C. § 103, arguing that the invention claimed in the '764 patent would have been obvious to one of ordinary skill in the art at the time the invention was made. Another basis for invalidity asserted by Dahlgren is that the '764 patent fails to disclose the best mode of carrying out the invention, as required by 35 U.S.C. § 112. Finally, Dahlgren has maintained that the patent is unenforceable because MacPhee and Baldwin engaged in inequitable conduct during the prosecution of the patent before the United States Patent and Trademark Office.

3. After reviewing all of the evidence presented on the validity of the patent, the Court concludes that Dahlgren has not carried its burden of proving invalidity by clear and convincing evidence. Accordingly, the '764 patent is found valid and enforceable.

4. Under 35 U.S.C. § 271(a), a person who makes, uses or sells any patented

invention in the United States during the term of the patent infringes the patent. In order to establish infringement, Baldwin need only prove infringement by a preponderance of the evidence. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). The claims of a patent define the invention. To determine whether Dahlgren's differential drive dampeners infringe one or more of the claims of the '764 patent, the claims of the patent must be compared with the products accused of infringement, the PX–2 and PX–164 devices. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481 (Fed.Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984). In determining infringement, the claims of the '764 patent are to be considered individually, for an action for infringement of the patent can be maintained for infringement of any valid claim of that patent. 35 U.S.C. § 288. "A patent is infringed if a single claim is infringed." *Intervet America, Inc. v. Kee–Vet Laboratories, Inc.*, 887 F.2d 1050, 1055 (Fed.Cir.1989).

5. Literal infringement occurs when the accused device literally corresponds with the words of the claims. "Literal infringement requires that every limitation of the patent claim must be found in the accused device." *Uniroyal*, 837 F.2d at 1054. Upon comparison of Dahlgren's differential drive units to the claims of the '764 patent, the Court concludes that Claim 10 is literally infringed by the PX–2 device and that Claims 1 and 7 are literally infringed by the PX–164 device.

6. In the alternative, the Court finds that the PX–2 and PX–164 devices infringe the '764 patent under the doctrine of equivalents. Under the doctrine of equivalents, infringement may be found even though the elements of the PX–2 and PX–164 devices, or processes performed thereby, are not identical to the literal words of the claims of the '764 patent. *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950). Baldwin has established infringement under the doctrine of equivalents because it proved at trial that the PX–2 and PX–164 devices perform substantially the same function, in substantially the same way, to produce substantially the same results as the invention of the '764 patent. *Id.*

7. Under 35 U.S.C. § 271(b), whoever actively induces infringement of a patent shall be liable as an infringer. Thus, a person may infringe by actively and knowingly aiding and abetting another's direct infringement. *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668–69 (Fed.Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). Although Dahlgren itself no longer directly makes, uses or sells the infringing devices, Dahlgren has provided technology, drawings, and know-how to Dahlgren U.S.A. through licensing agreements which have enabled Dahlgren U.S.A. to directly infringe the '764 patent. Therefore, on the basis of Dahlgren's inducement of direct infringement, Dahlgren is liable as an infringer for any infringement by Dahlgren U.S.A. of the '764 patent.

8. The Court of Appeals for the Federal Circuit has established a totality of the circumstances test for assessing the willfulness of infringement. *State Industries, Inc. v. Mor–Flo Industries, Inc.*, 883 F.2d 1573, 1581 (Fed.Cir.1989). The plaintiff must show by clear and convincing evidence that the defendant acted with no reasonable basis for believing it had the right to do so. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1440 (Fed.Cir.1988). The standard for proving willfulness is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *State Industries*, 883 F.2d at 1581.

9. Based on the totality of evidence presented at trial, the Court concludes that Baldwin established willful infringement. When a potential infringer has actual notice of another's patent rights, "he has an affirmative duty to exercise due care to determine whether or not he is infringing." *Underwater Devices, Inc. v. Morrison–Knudsen Company*, 717 F.2d 1380, 1389 (Fed.Cir. 1983). Dahlgren's affirmative duty included, inter alia, "the duty to seek and obtain com-

patent legal advice before the initiation of any possible infringing activity." *Ralston Purina Co. v. Far–Mar–Co. Inc.*, 772 F.2d 1570, 1577 (Fed.Cir.1985). Here, although Dahlgren sought advice of counsel, the advice given by counsel did not provide a sufficient basis for Dahlgren to conclude that it had a right to engage in the potentially infringing activity. Both the opinion by Shlesinger and the opinion by Sixbey recommended that Dahlgren further investigate the patent. Shlesinger suggested filing for reexamination of the '764 patent, and Sixbey suggested another legal opinion on infringement. Dahlgren did neither. A party's intentional disregard of the advice of counsel negates any inference of good faith in defeating a charge of willful infringement. *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983) ("Hormel's intentional disregard of its counsel's opinion negates any inference of good faith, placing Hormel in the same position as one who failed to secure the advice of counsel"). Accordingly, the infringement was willful.

■■■ 10. Under 35 U.S.C. § 284, once patent infringement is shown, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interests and costs as fixed by the court." Baldwin argues that damages should be based on Baldwin's lost profits. Baldwin opines that Dahlgren's infringement caused Baldwin to lose as much as $925,000 in sales. The evidence on lost profits, however, is entirely too speculative to support such an award. Any number of micro-economic or macro-economic factors other than Dahlgren's infringing activities may have accounted for the perceived decline in Baldwin's royalties from the '764 patent.

11. The Court concludes that the better measure of damages in this case is a reasonable royalty on the infringing products sold. The royalty Dahlgren charges its licensee, Dahlgren U.S.A., is instructive in determining a reasonable royalty. That royalty is 7½ percent. Baldwin's damages shall be determined by multiplying the 7½ percent royalty with the overall sales of the infringing differ-

ential drive units of PX–2 and PX–164 that have been produced by Dahlgren or Dahlgren U.S.A. since May 12, 1989, the date of confirmation of Dahlgren's Second Amended Plan of Reorganization. *See* Memorandum Opinion and Order, filed August 7, 1992, and effective June 22, 1992, *nunc pro tunc.* As provided by 35 U.S.C. § 284, Baldwin is also entitled to prejudgment interest and costs.

■■■ 12. In circumstances of willful infringement, the Court may, under 35 U.S.C. § 284, increase damages up to three times the amount found or assessed. The Court finds that Dahlgren's willful infringement of the '764 patent justifies trebling the damages in this case.

13. The evidence presently before the Court is insufficient to determine the total amount of Baldwin's damages. In particular, additional information is needed on the number and price of infringing units sold by Dahlgren or Dahlgren U.S.A. since May 12, 1989. Counsel for Baldwin and Dahlgren are **DIRECTED** to confer and provide by *noon, August 17, 1992* a report on damages consistent with this order that will enable the Court to calculate total damages. In the event the parties are unable to agree on the number and price of infringing units sold by Dahlgren or Dahlgren U.S.A. during the relevant time period, the Court will appoint a special master to resolve damages.

■■■ 14. Pursuant to 35 U.S.C. § 283, effective on the date of this order, Defendant Dahlgren and Dahlgren U.S.A. are enjoined from all acts of further infringement of the '764 patent. Patent law recognizes the ability to extend injunctions under Federal Rule of Civil Procedure 65 to include assignees of an infringer's assets, such as Dahlgren U.S.A., who purchased certain of Dahlgren International's assets after the patent infringement suit was filed against Dahlgren International. *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1581–82 (Fed. Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). Moreover, under Rule 65(d), a non-party comes under the scope of an injunction imposed against an infringing defendant if the non-party is "in active concert or participation" with the de-

fendant infringer. *See South Central Bell Telephone Co. v. Constant, Inc.*, 304 F.Supp. 732, 735–36 (E.D.La.1969), *aff'd,* 437 F.2d 1207 (5th Cir.1971).

15. Pursuant to 35 U.S.C. § 285, Plaintiff Baldwin is entitled to an award of reasonable attorneys' fees. Baldwin is **DIRECTED** to submit an affidavit detailing its attorneys' fees, consistent with prevailing Fifth Circuit authority, as enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974) and *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1092–97 (5th Cir.1982), by *noon, August 13, 1992.* Dahlgren's objections to that affidavit, if any, must be filed by *noon, August 19, 1992.*

SO ORDERED.