**YAMANOUCHI PHARMACEUTICAL CO., LTD., and Merck & Co., Inc., Plaintiffs,**

**v.**

**DANBURY PHARMACAL, INC., and Schein Pharmaceutical, Inc., Defendants.**

**YAMANOUCHI PHARMACEUTICAL CO., LTD., and Merck & Co., Inc., Plaintiffs,**

**v.**

**MARSAM PHARMACEUTICALS, INC., and Schein Pharmaceutical, Inc., Defendants.**

Nos. 97 Civ. 3403(RO), 97 Civ. 8357(RO).

United States District Court, S.D. New York.

Oct. 1, 1998.

Fitzpatrick, Cella, Harper & Scinto, Robert L. Baechtold, Hugh C. Barrett, Brian V. Slater, New York, NY, for Plaintiff Yamanouchi Pharmaceutical Co.

William Krovatin, Rahway, NJ, Arnold White & Durkee, John F. Lynch, Houston, TX, for Plaintiff Merck & Co., Inc.

Cummings & Lockwood, Barry Kramer, Steven J. Moore, James Jakobsen, Stamford, CT, for Defendants.

### OPINION

OWEN, District Judge.

Plaintiffs Yamanouchi Pharmaceutical Co., Ltd. and Merck & Co., Inc. have brought suit against defendant Schein Pharmaceutical, Inc. and its subsidiaries Danbury Pharmacal, Inc. and Marsam Pharmaceutical, Inc.,[1] for patent infringement under certain provisions of the Hatch–Waxman Act (the Act).[2]

Under the Act, generic drug producers can target a patented drug for future generic development upon the targeted drug's patent expiration. The Act serves to expedite both FDA approval and the subsequent production and marketing of the generic drug. First, the Act allows generic producers to rely upon the previous safety and efficacy testing conducted by the patent holder for the targeted drug, thus eliminating an earlier requirement that generic companies conduct their own testing prior to marketing a once-patented drug. *See Merck & Co. v. Kessler,* 80 F.3d 1543, 38 U.S.P.Q.2d 1347, 1349 (Fed. Cir.1996) (citing 21 U.S.C. § 355(j)(7)(B); H.R.Rep. No. 857, 98th Cong.2d Sess. Pt. 1, at 16–17 (1984)). Second, although generic producers, in order to avoid infringement, were previously required to await a targeted drug's patent expiration before using a patented drug in any manner to acquire FDA approval for commercial purposes, *see Roche Prod., Inc. v. Bolar Pharm. Co.,* 733 F.2d 858 (Fed.Cir.1984), now a generic producer may seek expedited FDA approval for generic marketing by submitting an Abbreviated New Drug Application (ANDA) prior to the targeted drug's patent expiration. *See* 21 U.S.C. § 355(j). *See also Bristol–Myers Squibb Co. v. Royce Labs., Inc.,* 69 F.3d 1130, 1131 (Fed.Cir.1995).

One of the grounds that can be asserted in an ANDA is that the targeted drug's patent is invalid. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). This claim, if successful, enables the generic producer to proceed and commence marketing prior to the targeted drug's theretofore patent expiration. 35 U.S.C. § 271(e)(1). However, when the generic producer makes a paragraph IV certification, the patent holder must receive notice of the ANDA's filing and the filing is deemed an infringement of the targeted drug's patent. *See* 21 U.S.C. § 355(j)(2)(B), 35 U.S.C. § 271(e)(2)(A).

This, obviously, forces the holder of the targeted drug's patent to litigate in order to protect its rights. After receiving notice of the ANDA filing, the patent holder has 45 days in which to sue the generic producer for infringement; otherwise the ANDA becomes "effective immediately", allowing for FDA approval and commercial exploitation of the generic drug prior to the targeted drug's patent expiration. 21 U.S.C. § 355(j)(4)(B)(iii). But, if the patent holder does timely bring suit, basically the FDA must suspend approval of the ANDA until either (1) a court ruling that the patent is

---

**1.** Yamanouchi, a Japanese corporation, is the patent holder, while Merck—the exclusive licensee for the patent at issue—is incorporated in and principally operates from New Jersey. Danbury, a Delaware corporation operating principally in New York, is the wholly-owed subsidiary of Schein, which is incorporated in Delaware and operates from New Jersey. Marsam, also wholly-owned by Schein, is a Delaware corporation operating from New Jersey. Federal ques- tion jurisdiction exists under 28 U.S.C. §§ 1331, 1338(a). For the sake of brevity, plaintiffs will be hereafter referred to collectively as Yamanouchi, and the defendants as Schein.

**2.** The Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 980417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 (1994) and 35 U.S.C. § 271(d)-(h) (1995)).

invalid, or (2) the patent, if found by the court to be valid, expires. 21 U.S.C. § 355(j)(5)(B)(iii).

If the court after resolution of the infringement issues finds the targeted drug's patent to be valid, and the generic producer has not yet begun the "manufacture, use, offer to sell, [ ] sale ... or importation into the United States" of the drug, the statute limits the patent holder's remedies for infringement to (1) a court order directing that FDA approval issue no earlier than the patent's expiration, (2) injunctive relief, and (3) an award to the infringed patent holder of its attorneys' fees in defending. 35 U.S.C. § 271(e)(4). *See also* 35 U.S.C. § 285; *Bristol–Myers Squibb Co.*, 69 F.3d at 1132.

Here, Yamanouchi is the inventor and sole licensor of famotidine, holding U.S. Patent No. 4,283,408 which expires October 15, 2000.[3] Merck, the exclusive licensee for famotidine, received FDA approval to market the compound in 1986 and has marketed it in the United States since that time under the trademark PEPCID ®. Defendant Schein Pharmaceutical, Inc. produces and markets generic drugs developed upon the expiration or defeat of existing patents held by other producers. To this end, it had a written contract with an attorney, Alfred B. Engelberg, Esq., to comb patents to develop arguably attackable subjects.

On approximately January 27, 1997, Schein, through its subsidiary Danbury, received an opinion of invalidity from Engelberg, though slightly hedged, *see infra*, as to PEPCID ®. Schein thereupon filed an ANDA for tablet and injectable versions of famotidine along with a paragraph IV certification that claim 4 of Yamanouchi's '408 patent covering famotidine was invalid for obviousness.[4] Yamanouchi and Merck were sent notice of the certification on or about March 26, 1997, along with supporting affidavits of two experts hired by Schein, Drs. Bernard Loev and John K. Siepler.

As compelled by the Act, Yamanouchi and Merck thereafter filed suit in this court on May 8, 1997, seeking a judgment that 1) Schein had willfully infringed the '408 patent by its ANDA filing under paragraph IV; 2) a permanent injunction under 35 U.S.C. § 271(e)(4)(B) barring defendants and all associated therewith from commercial exploitation of famotidine; 3) an order pursuant to 35 U.S.C. § 271(e)(4)(A) that FDA approval of Schein's ANDA proceed no earlier than October 15, 2000; and 4) an award of costs and attorney's fees as allowed for under 35 U.S.C. § 285 as referenced in 35 U.S.C. § 271(e)(4). In their answer, the defendants acknowledged the ANDA's filing as a statutory infringement, but denied that the infringement was willful and challenged the validity of Yamanouchi's '408 patent.[5]

3. The famotidine compound is described in claim 4 of the '408 patent, and all findings and conclusions made in this case relate solely to that claim. The patent is entitled "GUANIDINOTHIAZOLE COMPOUNDS, PROCESS FOR PREPARATION AND GASTRIC INHIBITING COMPOSITIONS CONTAINING THEM", filed under Serial No. 107,629 on December 27, 1979. The application claimed as priority Yamanouchi's Japanese patent, held as assignee of the inventors, under No. 54–98906 as filed on August 11, 1981. The patent ultimately issued to Yamanouchi on August 11, 1981. The undisputed effective filing date for that claim 4 is, however, August 2, 1979 under the priority attaching to the Japanese patent filing.

4. On November 12, 1997, Schein, again through Danbury, filed an amended ANDA, in particular adding an additional tablet size to its application. Thereafter, plaintiffs sought and received leave from this court to amend the complaint in order to address the Schein's additional ANDA claims.

5. Thereafter, defendant Marsam filed three additional ANDAs, seeking approval to market various injectable versions of famotidine. Notice was sent to the plaintiffs on October 7, 1997. Plaintiffs filed suit as required on November 10, 1997. The case was thereafter consolidated with the previously filed case on November 25, 1997. Corrected notice letters regarding the three Marsam ANDAs was later sent to the plaintiffs on December 10, 1997, after which the plaintiffs sought and received leave to amend the complaint to address the three filings. Leave was granted by the order of Judge Baer on January 7, 1998, and the amended complaint was filed on January 15, 1998. Finally, on January 10, 1998, Schein and Danbury notified plaintiffs that they were revising the initial ANDA to add other tablet sizes and varieties. Leave was sought and received to amend the complaint to address this modification by my order of March 6, 1998, with the second amended complaint filed thereafter on March 12, 1998.

Accordingly, over several days, starting on April 8, 1998, I tried the issue of the validity of Yamanouchi's '408 patent. Schein, having the burden of proving the patent's invalidity by clear and convincing evidence, presented its case first. At the end of Schein's case, Yamanouchi moved for partial judgment on the issue of obviousness, *see* Fed.R.Civ.P. 52(c). I ruled from the bench that Schein had failed to meet its burden and found that claim 4 of Yamanouchi's '408 patent regarding famotidine was valid and nonobvious.

While Schein had concentrated on its claim that the famotidine patent was structurally obvious, and contended that famotidine's properties were irrelevant to my analysis, I concluded then, and reiterate, that neither is the case. In the first instance, I noted from the bench that I could not credit Schein's main scientific witness, and ruled that, in any event,

I find that [Schein] has utterly failed to meet its burden by clear and convincing evidence that this was structurally obvious. There are several critical changes, switches, substitutions, and so on that have taken place here between various products that are out there or were considered or were written up, and it [the case here] has

all the earmarks of somebody looking at this from hindsight and saying, if we do this and we do that and we do the other and we've got a nice chart and we come back, there it is—it is obvious. I reject that.

Tr. (Apr. 8, 1998), p. 559. Moreover, I concluded that—even if famotidine were structurally obvious, its patentability was clearly supported by famotidine's after-discovered superior properties. *Id.* at 560. In so ruling, I cited several rulings to identical effect.[6] Accordingly, my conclusions at the close of Schein's case find support within the following findings of fact and conclusions of law:

■ The basis for Schein's Paragraph IV certification is that famotidine's structure was obvious at the time it was patented, as prohibited under 35 U.S.C. § 103.[7] There is, however, a presumption of validity, and Schein had the burden of proof to establish invalidity by clear and convincing evidence. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1562 (Fed.Cir.1988) The test for obviousness is "whether the claim at issue would have been obvious to one of ordinary skill in the art at the time of patent", *Avia Group Int'l, Inc.,* 853 F.2d at

6. For instance, as stated at trial, in the *Application of Bernard L. Zenitz,* 52 C.C.P.A. 746, 333 F.2d 924 (CCPA 1964), the Court stated

[T]he mere failure of a patentee to realize all the benefits and possibilities of his invention is not fatal. The after-discovery of unsuspected usefulness in a disclosed apparatus, far from detracting from its value, may serve to enhance it. It is the benefits which test, use, and time unfold that really determine merit .... Zenitz disclosed a tranquilizer and subsequently established that if it is used as a tranquilizer and subsequently established that if it used as a tranquilizer, it is a better one, for it minimizes the side effects of hypotensive activity. Therefore, we think the latter proper must be considered in determining the patentability of the claimed compound.

*Id.* at 749–50, 333 F.2d 924.

Moreover, the Court of Customs and Patent Appeals has reversed a Patent Board rejection of patent, finding the patent to be non-obvious based upon the conclusion that

"the showing of a prolongation of the duration of activity beyond what could reasonably be expected by the man of ordinary skill in the art makes it unnecessary for us to pass on the issue of whether appellant's claimed compounds are structurally obvious since, even if

they are, the *prima facie* case which that would make for the Patent Office has been overcome by the evidence introduced by the appellants."
*Application of Blondel,* 499 F.2d 1311, 1317–18 (CCPA 1974).

7. Under 35 U.S.C. § 282, there are several bases for claiming a patent to be invalid, including "any ground stated in part II of this title as a condition of patentability" (i.e., failure to satisfy, inter alia, any one of the requirements of novelty, utility, or nonobviousness found in sections 101, 102, and 103) and "failure to comply with any requirement of Sections 112 or 251 of this title." *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 453 (Fed.Cir.1985). Section 103 reads

A patent may not be obtained though the invention is not identically disclosed or described ..., if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103.

1563, not whether the claim was " 'obvious to try' ". *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1380 (Fed.Cir. 1986) (citing *Jones v. Hardy,* 727 F.2d 1524, 1530 (Fed.Cir.1984)). In adjudicating obviousness, four factors must be considered:

(1) the scope and content of prior art;

(2) the differences between prior art and claims at issue;

(3) the level of ordinary skill in the art at time the invention was made; and

(4) secondary considerations, such as commercial success, the failure of other producers to develop similar patents, the long-standing need for the patent's subject matter, and any unexpected results inherent to the patent at issue, as well as the wide acceptance and recognition of the claimed invention.

*See, e.g., Orthopedic Equip. Co., Inc. v. United States,* 702 F.2d 1005, 1008 (Fed.Cir.1983) (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)); *Kloster Speedsteel, AB v. Crucible Inc.,* 793 F.2d 1565, 1572–1575 (Fed.Cir.1986).

■ Finally, and of major importance due to the contentions at trial, obviousness is not determined as if the designer had hindsight knowledge of the patented design.[8] *L.A. Gear, Inc. v. Thom McAn Shoe Company,* 988 F.2d 1117, 1124 (Fed.Cir.1993).

■ During the 1960s and 1970s, pharmaceutical companies began to search out antiulcer compounds that would suppress gastric acid secretion. Of particular interest were Histamine–2 antagonist ($H_2$ antagonist) drugs. In certain biological contexts, these block histamines, a type of chemical messenger found in the body that triggers certain reactions when they attach to certain sites (in this instance, "$H_2$ receptors"). The $H_2$ antagonist works by attaching itself to the $H_2$ receptor, blocking the histamine from doing so and thus inhibiting the biological reaction to the histamine's attachment. Of particular

relevance here, when a histamine attaches to an $H_2$ receptor in stomach cells, the consequent chain reaction produces gastric acid. When an $H_2$ antagonist attaches to the same receptor, however, acid is not produced and the histamine is blocked from attaching to the receptor. Thus, when $H_2$ antagonists are introduced, by way of a drug, the result is the reduction of gastric acid.

The first $H_2$ antagonist compound, called burimamide, was developed by SmithKline in 1972. Although the compound blocked $H_2$ receptors in the laboratory setting, regulatory approval was withheld due to ineffective oral dosing. Next, SmithKline developed metiamide, which was more potent and did have oral availability, but failed in clinical trials due to incidents of kidney damage and white blood cell loss. After eight years of initial testing, involving over 800 compounds, and an additional five years of animal and human testing, SmithKline's third relevant attempt resulted in cimetidine, which had metiamide's potency without its side effects. Yet, although cimetidine was approved by the FDA in 1977, it was later discovered that the compound caused metabolic blockage through the interference with particular liver enzymes that caused the build up of certain drugs to toxic levels, and that it also caused impotence and breast swelling in men at high doses.

Notwithstanding these unexpected problems, however, the development of effective and safe $H_2$ antagonist compounds quickly became the goal of numerous pharmaceutical producers, with research and development in the field eventually leading to more than 11,000 potential $H_2$ antagonists, of which less than fifty ever made it into human clinical trials. Most of the compounds developed were withdrawn due to, among other things, insufficient potency, side effects, or toxicity.

As of today, only four of the 11,000 compounds have gotten FDA approval and entered the market. As noted, cimetidine was the first, in 1977,[9] followed in 1983 by raniti-

---

8. "It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness

in a court of law." *Orthopedic Equipment Co., Inc. v. United States,* 702 F.2d 1005, 1012 (1983).

9. SmithKline Beecham sells cimetidine in the United States as TAGAMET ®.

dine.[10] Famotidine, at issue here, received approval in 1986 and nizatidine followed in 1988.[11] While all four of these drugs were originally available only by prescription, they have since been approved for over-the-counter sale, although at lower doses. Moreover, since their patent expirations in 1994 and 1997, respectively, cimetidine and ranitidine have been available generically.

Schein's basic argument that a hypothetical chemist of ordinary skill in the field would have been motivated—at the time of patent—to take the myriad components of various teachings of prior art and combine them to create famotidine's exact structure is dispelled not only by the more than 11,000 arguably potential compounds, see supra, but also the complexity of these formulae, well demonstrated at a judicially basic level by the following, taken from an exhibit at the trial. Specific note should be taken of the fact that while there are some chemical similarities as to famotidine and a predecessor, tiotidine, the latter had to be abandoned for having unexpected carcinogenic side effects.[12]

SmithKline's trademark for cimetidine. Cimetidine has the following structure:

An $H_2$ antagonist sold by Glaxo–Wellcome under the trademark ZANTAC ®. Ranitidine has the following structure:

An $H_2$ antagonist sold by Merck under the trademark PEPCID ®. Famotidine has the following structure:

An $H_2$ antagonist sold by Eli Lilly under the trademark AXID ®. Nizatidine has the following structure:

10. Ranitidine is sold in the United States by Glaxo–Wellcome as ZANTAC ®.

11. Nizatidine is sold in the United States by Eli Lilly as AXID.®

12. So much for predictability in the field.

$$CH_2-S-CH_2-CH_2-NH-C-NH-CH_3$$

(structure showing thiazole ring with $CH_3\text{-}N\text{-}CH_2$ substituent, and $CH-NO_2$ below the carbon)

An $H_2$ antagonist made by ICI but not approved by the F.D.A. Tiotidine, initially identified as ICI 125,211, was found to cause cancer in rats. Tiotidine has the following structure:

$$CH_2-S-CH_2-CH_2-NH-C-NH-CH_3$$

(structure showing thiazole ring with $H_2N\text{-}C\text{=}N\text{-}H_2N$ guanidine substituent, and $N-C≡N$ below the carbon)

Accordingly, from the testimony at trial, I conclude that nothing in the prior art suggests such a motivation, *or* the "extra extraordinary" result, according to Dr. Loev, Schein's expert, which was reached through Yamanouchi's efforts, and certainly not to a chemist of ordinary skill.[13] Yamanouchi chose from a myriad of structural components, with no well-founded data as to the eventual result of any of its choices. The evolution of famotidine, I conclude, was therefore not obvious to researchers with ordinary skill in the art, and Schein's claim is speculative even when based upon the hindsight limited to chemical formulae that is really all that it has going for it.

Next, as observed earlier, Schein's contentions not only ignore the subtle reaction and substantive effects resulting from variations in a chemical structure as a whole, but also treat as irrelevant and therefore completely dismiss the consequent properties, expected and unexpected, such as activity, potency, toxicity and lack of side effects that set famotidine apart.

Turning to Famotidine's properties beyond its structure. In the development of $H_2$ antagonist compounds, the drug industry could not necessarily determine a given compound's activity from its chemical structure. Only by testing a compound after varying its structure, through substitution of an entire grouping or its substituents, could a compound's potential activity be ascertained. In addition, the range of possible activity is broad. For instance, while SmithKline's patents, including cimetidine, provide data in the form of ranges of activity, using cimetidine as a benchmark, SmithKline's $H_2$ antagonist patents vary to the extent of being ten times as active as cimetidine down to as low as 256 times less active than cimetidine. The later ranitidine, as noted above, was three to eleven times more active than cimetidine. Furthermore, although the generalized data disclosed by ICI demonstrated an increased activity in its compounds, including tiotidine,

**13.** The level of ordinary skill in the art at time the invention was made is determined by considering "the various prior art approaches employed, the types of problems encountered in the art, the rapidity with which innovations are made, the sophistication of the technology involved, and the educational background of those actively working in the field[.]" *Orthopedic Equipment Co., Inc.,* 702 F.2d at 1011. The determination is made "entirely with reference to a *hypothetical* 'person having ordinary skill in the art.' It is only that hypothetical person who is presumed to be aware of all the pertinent prior art. The actual inventor's skill is irrelevant to the inquiry.... One should not go about determining obviousness under § 103 by inquiring into what patentees (i.e., inventors) would have known or would likely have done, faced with the revelations of references. A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which." *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir.1985).

toxicity and carcinogenic properties destroy their medical value.

This leaves famotidine as the most potent $H_2$ antagonist on the market. While ranitidine is three to eleven times more potent than cimetidine, famotidine is from twenty to thirty times more potent than cimetidine. Its therapeutic action is also more durable than either of its precursors. These properties allow for less frequent dosing and, thus, ease in treatment of various gastric disorders. Additionally, famotidine does not exhibit the side effects and safety hazards of any previous compound explored, such as impotence or breast swelling in males, or adverse drug interactions leading to toxic buildup in the liver as with cimetidine, or causing cancerous lesions as with tiotidine. Even Schein's expert witnesses have conceded that these properties were not obvious from famotidine's structure at the time of patent.

Schein contends however that these superior properties are undercut by the fact that famotidine's use leads to the same therapeutic result as previously patented $H_2$ antagonists. Yet, I find that the prior art did not suggest that famotidine's structure would lead to the level of potency and absorption, as well as the lack of side effects, that famotidine ultimately presented. While, clearly, the hope that the famotidine compound—among others—would prove efficacious spurred Yamanouchi's efforts, there was no obvious result from famotidine's specific structure that caused Yamanouchi to structure famotidine as it did.

In addition to the above analysis, in order to make a conclusion as to a patent's obviousness, a court may consider evidence of certain "secondary considerations", such as a patented product's unexpected results and commercial success, the failure of others in attempting to produce such a product, any long-standing need for the product, and the wide acceptance and recognition of the result. *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976

F.2d 1559, 1573 (Fed.Cir.1992). "[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record... [and] may often establish that an invention appearing to have been obvious in light of the prior art is not." *Id.*

■ Although commercial success is relevant only if a connection is shown between the success and the merits of the claimed invention, *Avia Group Int'l, Inc.*, 853 F.2d at 1564, the passage of time between conceptualization and success is not, standing alone, enough to negate the connection. *Kloster Speedsteel, AB*, 793 F.2d at 1574 (citing *Windsurfing Int'l, Inc. v. AMF Inc.*, 782 F.2d 995, 1000 (Fed.Cir.1986)). Here, unusual factors particularly negate Schein's contention that famotidine's commercial performance is mediocre at best. Merck's PEPCID ® sales currently exceed $1 billion dollars annually. Despite this, Schein contends that Merck's market share in relation to other $H_2$ antagonists refutes Yamanouchi's claim of commercial success.[14] This, however, ignores the fact that Merck's two main competitors, cimetidine and ranitidine, have been available on the generic market since 1994 and 1997 respectively and despite their being more cheaply available at this point in time, Merck's famotidine has held onto its historical market share, with its efficacy being reflected in its market return.

■ Thus, the long-standing need for a compound with the effectiveness of famotidine as well as the failure of others to meet that need is further support for my conclusion of famotidine's non-obviousness. The record is clear that the pharmaceutical industry at large was attempting to improve upon existing $H_2$ antagonists with only a small number of producers coming close to success. *See, e.g., Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1574 (Fed.Cir.1992). Moreover, the fact that famotidine's structure was unexpectedly successful, both as to potency and absence of side effects, was demonstrated at trial.[15] Accordingly, I conclude that Schein's

---

**14.** On the basis of market share alone, PEPCID ® falls behind both TAGAMET ® and ZANTAC ®.

**15.** In addition, I observe that Schein's argument that Yamanouchi's use of tiotidine's *bridge group* in famotidine's structure was an "obvious" choice is undercut by the fact that tiotidine was

claim of obviousness fails and that claim 4 of Yamanouchi's '408 patent for famotidine is valid.

 Given the foregoing, the remaining issue is whether Schein's ANDA filing constituted a willful infringement in that it was not made upon a reasonable basis, causing this to be an "exceptional" case making appropriate an award of attorneys' fees to Yamanouchi and Merck. The Hatch–Waxman Act clearly contemplates such a possible conclusion. *See* 35 U.S.C. § 285.

In filing its paragraph IV certification along with its ANDA, Schein represented that "in the opinion of the applicant and to the best of its knowledge" the famotidine patent was invalid. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV). However, the patent law imposes an affirmative duty of due care on one making such an assertion, and this standard is applied in determining if one such as Schein had an objective good faith basis for such action.

As alluded to earlier, Schein contracted in December 1992 with outside counsel Engelberg to identify up to six potential challenges to existing drug patents and to provide written invalidity opinions to Schein by September of 1993. Once Engelberg chose the various challenges, Schein would then go forward with development of the pertinent drugs, providing that a commercial market for the drug existed and the raw materials necessary to its production were available. Engelberg was not to be directly compensated for writing the challenge opinions, but instead would receive fifty percent of the "Marginal Gross Profit" of any of the drugs' sales if its corresponding patent challenge was successful. Additionally, if Engelberg himself defended in the litigation flowing from a challenge, Schein was not to pay fees for his services. If he delegated that function to another law firm, Schein was required to pay the relevant fees, but the same would then be deducted from Engelberg's eventual profit share. The arrangement, however, did contemplate that an award of attorneys' fees could be imposed against Schein as to any of the identified challenges, and that Schein alone would be responsible for such an event.

On January 7, 1993, Engelberg wrote Schein's Chief Executive Officer, Martin Sperber, identifying potential challenges to two $H_2$ antagonist drugs having "significant markets": famotidine (PEPCID ®) and nizatidine (AXID ®), tentatively noting later by letter of August 15, 1993, that—while actual opinions were not yet forthcoming—he believed the case against nizatidine to be slightly stronger than that against famotidine, and he had this reservation of confidence even before he was aware of an embarrassing factual error in his workup, *see, infra,* note 21. Engelberg then submitted an unsigned and undated famotidine challenge opinion to Schein on October 29, 1993. In his cover letter attached thereto, Engelberg was obviously of the belief that Schein was thereafter "required" to proceed with development of famotidine, although his contract with Schein has arguable ambiguity in this area. In any event, Schein did thereafter file its ANDA and paragraph IV certification challenging the validity of the famotidine patent.

While Engelberg's opinion, dated the prior month, September, spoke in a luke-warm fashion as to famotidine's properties,[16] it did not speak at all of the compound's safety record or its lack of side effects, and did observe, "Evidence that a compound is unexpectedly superior in one of a spectrum of common properties may be enough to rebut a *prima facie* case of obviousness." Whatever else, this clearly happened here in addition to a lack of obviousness.

Further, in concluding that the famotidine patent could fall due to obviousness, Engel-

---

found to cause cancerous lesions in rats. If an inventor takes steps that the prior art suggests cannot be made, it is probative of non-obviousness. *See, e.g., Kloster Speedsteel, AB,* 793 F.2d at 1573.

**16.** Engelberg's report reads:
At the time of its approval in October 1986, the FDA gave PEPCID a "C" rating to signify the

belief of its expert advisory panel that the drug offered little or no advantage over existing $H_2$ antagonist therapies such as cimetidine (TAGMET) and ranitidine (ZANTAC).
This assertion failed to take note of the after-discovered successful properties, which have both factual and legal significance in determining patentability, *see* pp. 6–7 *supra.*

berg in his opinion emphasized "Of particular significance [in the ICI patents] is the disclosure in the Yellin '378 patent of compounds in which $R_2$ contains precisely the same

$$-\underset{\underset{NH_2}{|}}{C}=NSO_2-NR \qquad \text{where R=alkyl or amino}$$

which is present in the $R_2$ group of famotidine. In fact, the only difference between the $H_2$ antagonists disclosed by Yellin and the compounds claimed as the invention in the Yamanouchi '408 patent is the presence of an $NH_2$ group linking the foregoing $SO_2$-containing $R_2$ group to the $-CH_2-S-CH_2-CH_2$bridge structure." However, Schein's expert at trial, Dr. Loev, conceded that Engelberg's interpretation of the ICI patent was patently incorrect and that the ICI patent nowhere described the formulation relied upon by Engelberg. *See, infra,* note 21. Regardless, at trial, Schein affirmatively elected not to rely upon the advice-of-counsel defense in response to the charge of willful infringement, although it did produce Engelberg's October 1993 opinion along with several letters between Engelberg and Sperber on a selective, "non-waiver of privilege" basis. Other related documents created prior to the ANDA certification were withheld under a claim of privilege, however, and were not put before me.

Next, while Schein's ANDA paragraph IV certification did not repeat Engelberg's error regarding the ICI patent, *see infra* note 21, it again made no reference to famotidine's potency, safety and lack of side effects, and did not mention ICI's tiotidine patent, an element of prior art greatly relied upon by Schein at trial. Additionally, Dr. Loev's supporting affidavit (which was later extensively revised in his written trial submission) stated that in 1979 he could only have predicted that famotidine "to be an $H_2$ antagonist" and,

based on prior art, that it would "have a potency at least in the range of ranitidine," Tr. (Apr. 7, 1998) at p. 271–72, and that he had never expressed an opinion to Schein that famotidine's structure was obvious at the time of patent. Tr. (Apr. 8, 1998) at 447. Moreover, Dr. Loev admitted at trial that, as of 1992, he could not tell from its chemical structure whether it would be toxic nor predict its lack of side effects. He further testified that he could not predict the effects on potency that would be caused by the structural manipulations he claimed to be obvious.[17] *See* Trs. (Apr. 7–8, 1998) at pp. 271–72, 465.

Thus, on the foregoing, I find clear and convincing evidence that Schein's proceeding here was without adequate foundation and speculative at best. It was based on Engelberg's error, chargeable to Schein, it was essentially limited to the structure, and it failed to consider the applicability of the law regarding "unexpected results," etc. Further, the weakness of Loev's 1979 supporting affidavit, discussed above, left Schein, objectively, "with no reasonable basis for believing it had the right [by clear and convincing evidence to assert obviousness]", *Baldwin Technology Corp. v. Dahlgren Int'l Inc.*, 819 F.Supp. 568, 576 (N.D.Tex.1992) (citing *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1440 (Fed.Cir. 1988)). Little separates the foregoing from whether or not Schein's infringement, "artificial" or not,[18] was willful, and whether this

---

17. In addition, in his written testimony, Dr. Loev said that tiotidine, at 11 times the potency of cimetidine, was "extraordinarily potent", Loev Testimony, p. 22, and at trial, in noting that famotidine is 40 times more potent as cimetidine, Dr. Loev agreed that famotidine was "extra extraordinary". Tr. (Apr. 7, 1998) at pp. 267–68.

18. Schein argues that the ANDA infringement created by the Act is merely an "artificial" one, instituted by Congress solely for the purpose of created federal jurisdiction for the defensive litigation required by the Act upon an ANDA filing

that includes a paragraph IV certification. While it has been noted that the ANDA infringement is an "artificial" one for the purposes argued by Schein, *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 675, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990), the Federal Circuit has elaborated that the ANDA filing represents a substantive infringement if the generic drug that would ultimately be produced under the ANDA would infringe the targeted drug. *See Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed.Cir. 1997). There is nothing on this record to even remotely suggest that what Schein intended to

case is an "exceptional" one thus and whether a fee award would thus be proper, *Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568, 1572 (Fed.Cir.1988).

 Under a "totality of the circumstances" analysis, I look not only to the foregoing, but also to commercial factors that may have affected Schein's actions to determine whether they amount to willful infringement. *See SRI Int'l, Inc. v. Advanced Technology Labs., Inc.,* 127 F.3d 1462, 1465 (Fed. Cir.1997). The test is "'whether, under all circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed.'" *Baldwin Technology Corp.,* 819 F.Supp. at 576 (quoting *State Indus., Inc. v. Mor–Flo Indus., Inc.,* 883 F.2d 1573, 1581 (Fed.Cir.1989)); *Hoechst Celanese Corp. v. BP Chemicals Ltd.,* 78 F.3d 1575, 1583 (Fed.Cir.1996). Finally, "[t]he law of willful infringement does not search for minimally tolerable behavior, but requires prudent, and ethical, legal and commercial actions." *SRI Int'l, Inc.,* 127 F.3d at 1465. Taking this into account, with particular reference to the issues of privilege and the advice-of-counsel argument discussed below,

I conclude that Schein's ANDA filing in relation to the famotidine patent was, objectively, a willful infringement, intentionally undertaken. *See, e.g., Kloster Speedsteel, AB v. Crucible Inc.,* 793 F.2d at 1580. Included in this is an obligation to seek and obtain competent legal advice before initiating any possibly infringing activity. *Kloster Speedsteel, AB,* 793 F.2d at 1579.[19] In the first instance, any reliance on legal advice regarding the invalidity of a challenged patent must be such that it "could have reasonably been relied upon" given its nature, thoroughness, competence, and objectivity. *SRI Int'l, Inc.;* 127 F.3d at 1465, 1467. Here, the only legal opinion Schein was willing to present was formulated by Engelberg, an attorney with a stake in the outcome, *see Minnesota Mining and Mfg. Co.,* 976 F.2d at 1581, which contained what Schein's own expert witness, Loev, conceded to be an obvious mistake,[20] and omitted a factor of prior art which, notwithstanding its vulnerability, Schein argued at trial to be clear evidence of the famotidine patent's obviousness.[21] When viewed as a whole, these facts tarnish beyond recognition Schein's claim that at the time of its ANDA filing it had a good faith reasonable basis for

manufacture, use or sale under its ANDA filing in this case would *not* infringe the famotidine patent.

19. I do observe, however, that failure to secure counsel's advice is but a factor in the willfulness analysis, and is not definitive on the issue. *See Avia Group Int'l, Inc.,* 853 F.2d at 1566. Moreover, I note that the fact that an opinion was obtained does not always and alone dictate a finding that the infringement was not willful. The test, again, is the totality of the circumstances. *Kloster Speedsteel, AB,* 793 F.2d at 1579.

20. PLAINTIFFS' COUNSEL: Doctor, I am going to show you an opinion letter with Mr. Engelberg's name on it . . . .

 \* \* \* \* \* \*

It says "Of particular significance is the disclosure in the Yellin '378 patent."

Let's just stop. That's the one we just looked at is it not, sir?

WITNESS LOEV: Yes.

PLAINTIFFS' COUNSEL: "Of compounds in which R2 contains precisely the same" and then there's the polar tail of famotidine, "where R equals alkyl or amino—"

WITNESS LOEV: Yes.

PLAINTIFFS' COUNSEL:—"which is present in the R2 group of famotidine." That's wrong, isn't it?

WITNESS LOEV: It is wrong. I pointed that out to him sometime back.

PLAINTIFFS' COUNSEL: Did you point that out to him in 1993, Doctor?

WITNESS LOEV: I don't remember. When I read it, which wasn't this, I remember saying that, no, that was a mistake.

PLAINTIFFS' COUNSEL: So the point made in that opinion that's characterized as being of particular significance is wrong as a matter of elementary chemistry, is that right?

WITNESS LOEV: Only with respect to it containing the NH2 group.

PLAINTIFFS' COUNSEL: Only with respect to the precise polar tail that's in famotidine, isn't that right?

WITNESS LOEV: Yes. . . .

 \* \* \* \* \* \*

Tr. (April 7, 1998) at pp. 316–320.

21. Engelberg's opinion did not mention the ICI patent (abandoned for a cancer in rats, *supra*) relied upon at trial by Schein in its attempt to establish a "obvious" chain of prior art leading to famotidine's structure.

its certification that the famotidine patent was invalid.[22] Moreover, while the record reveals that there exist somewhere out there various other opinions on famotidine between Engelberg and other counsel and Schein, all of these were shielded by Schein behind the attorney-client privilege or alluded to as justification, depending upon its convenience.[23] In such an instance, the law allows an adverse inference which only serves to support my conclusion that Schein infringement here was a willful one. *L.A. Gear, Inc.*, 988 F.2d at 1126.

Schein contends however that the only relevant opinions in this case are the affidavits submitted along with its paragraph IV certification, which embody *prior* counsel's opinions. Yet the courtroom testimony of one of those affiants, Schein's scientific expert Dr. Loev, shows that he could not and did not conclude that at the time of patent, a skilled chemist in the field could predict from famotidine's structure its lack of toxicity, side effects, or potency, Tr. (Apr. 7, 1998) at 271–274, and that he did not at that time express the opinion that famotidine's composition was structurally obvious. Tr. (Apr. 8, 1998) at p. 447.

As stated by the Federal Circuit, when an infringer turns aside from reason and undertakes a clear risk of infringement, and "employs the judicial process with no solidly based expectation of success, [it] can hardly be surprised when [its] infringement is found to have been willful." *Minnesota Mining and Mfg. Co.*, 976 F.2d at 1581 (quoting *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1429 (Fed.Cir.1988)).

■ Having found Schein's infringement to be willful, I turn to Section 285, which allows for an award of attorneys' fees in "exceptional cases". 35 U.S.C. § 285. Finding a case to be exceptional, justifying attor-

neys' fees, is discretionary, and while a finding of willfulness does not mandate a fee award, it is sufficient—standing alone—to warrant such an award. *See Avia Group Int'l, Inc.*, 853 F.2d at 1567. Forcing a plaintiff to doubtless incur considerable unjustified expense[24] to defend against an ill-supported claim supports this conclusion. *See Saf–Gard Prods., Inc. v. Service Parts, Inc.*, 491 F.Supp. 996, 1005 (D.Az.1980). Moreover, despite Schein's contention otherwise, although the Hatch–Waxman Act clearly contemplates patent challenges under its statutory scheme, its express inclusion of attorney's fees as a possible consequence of an unsuccessful challenge is a reasonable basis for the legal conclusion—and sensible commercial view—that a challenge without reasonable basis has its cost. Accordingly, attorneys' fees are awarded to Yamanouchi and Merck in an amount to be determined hereafter on the basis of evidentiarily competent submissions. A hearing may be requested of the court as to any issue or issues that arise.

In sum, the famotidine patent is valid; Schein willfully infringed that patent; attorneys' fees are awarded to plaintiffs to be hereafter established. Submit order on notice.

---

**22.** "[A]n opinion of counsel does not guarantee against a finding of willfulness." *Minnesota Mining and Mfg. Co.*, 976 F.2d at 1580. The key is the competence of the counsel and advice relied upon. *See id.*

**23.** After Schein's case rested, and once I ruled from the bench that the famotidine patent was valid, Schein's counsel attempted disclosure of those opinions in order to thwart any finding of

willfulness. I denied the application, taking note of the last minute obvious manipulation of the attorney-client privilege at a time during the late stages of the trial when any meaningful, realistic discovery as to these documents was foreclosed. Tr. (Apr. 8, 1998) at pp. 563–64.

**24.** Schein's fees to attack, I was told, were in the area of $1,000,000.